ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2026-Apr-07 19:00:35
60CV-26-4332
C06D11 : 39 Pages

**IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS**
**CIVIL DIVISION**

**CHRISTIE CHAPPEL, INDIVIDUALLY AND AS SURVIVING SPOUSE OF WAYLON DUVAL CHAPPEL, DECEASED; BRANDI CHAPPEL (DAVY'ANCE); AND BRADASHA CHAPPEL**

**PLAINTIFFS**

**v.** **NO. ________**

**ABBOTT LABORATORIES; ST. JUDE MEDICAL, INC.; THORATEC CORPORATION; THORATEC, LLC; BAPTIST HEALTH d/b/a BAPTIST MEDICAL CENTER-LITTLE ROCK; BAPTIST HEALTH HEART INSTITUTE; JOHN RANSOM M.D**

**DEFENDANTS**

**PLAINTIFFS' ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs Christie Chappel, Individually and as Surviving Spouse of Mr. Duval Chappel, Deceased; Brandi Chappel (Davy'Ance); and Bradasha Chappel, and file this Original Complaint against Defendants Abbott Laboratories; St. Jude Medical Inc., Thoratec Corporation; Thoratec, LLC; Baptist Health d/b/a Baptist Health Medical Center–Little Rock, Baptist Health Heart Institute, and John Ransom M.D and allege as follows:

## I. CLAIM FOR RELIEF

1. Plaintiffs seek monetary relief over $10,000,000.

## II. PARTIES

### *A. Plaintiffs*

2. Plaintiff Christie Chappel is the surviving spouse of Waylon Duval Chappel and brings this action individually and on behalf of all statutory beneficiaries as determined at the time of his death pursuant to Ark. Code Ann. § 16-62-102.

3. Plaintiff Christie Chappel was married to Mr. Chappel for twenty-four years at

EXHIBIT 2

the time of his death and resided with him at 425 Columbia Road 38, Magnolia, Arkansas 71753. At all relevant times, including at the time of Mr. Chappel's death, Plaintiff Christie Chappel was a resident and citizen of the State of Arkansas.

4. Plaintiff Brandi Chappel (Davy'Ance) is a daughter of Mr. Chappel and was, at the time of his death, a statutory beneficiary under Ark. Code Ann. § 16-62-102.

5. Plaintiff Bradasha Chappel is a daughter of Mr. Chappel and was, at the time of his death, a statutory beneficiary under Ark. Code Ann. § 16-62-102.

## *B. Defendants*

6. Defendant Abbott Laboratories is an Illinois corporation with its principal place of business located at 100 Abbott Park Road, Abbott Park, Illinois 60064. Abbott regularly conducts substantial business in the State of Arkansas, including the manufacture, distribution, marketing, and sale of medical devices, including the HeartMate 3 Left Ventricular Assist System ("HeartMate 3"). Abbott may be served with process through its registered agent for service of process, C T Corporation System, 320 S. Izard Street, Little Rock, Arkansas 72201-2114, or wherever it may be found.

7. Defendant St. Jude Medical, Inc. ("St. Jude Medical") is a corporation organized under the laws of the State of Minnesota with its principal place of business located at One St. Jude Medical Drive, St. Paul, Minnesota 55117. St. Jude Medical acquired Thoratec Corporation in 2015 and thereafter directed and/or controlled aspects of the development, manufacture, marketing, and distribution of the HeartMate 3. In 2017, Abbott Laboratories acquired St. Jude Medical. Upon information and belief, as a result of that acquisition, Abbott has assumed and/or maintains control over the operations, liabilities, and service of process for St. Jude Medical. St. Jude Medical may be served with process through its registered agent for

service of process, C T Corporation System, 320 S. Izard Street, Little Rock, Arkansas 72201-2114. Service upon Abbott's registered agent is therefore proper for this Defendant, in addition to service wherever it may be found.

8. Defendant Thoratec Corporation was a California corporation with its principal place of business formerly located in Pleasanton, California, which developed and manufactured the HeartMate 3 and conducted substantial business in the State of Arkansas. In 2015, St. Jude Medical acquired Thoratec Corporation, and in 2017, Abbott Laboratories acquired St. Jude Medical. Upon information and belief, as a result of those acquisitions, Abbott has assumed and/or maintains control over the operations, liabilities, and service of process for Thoratec Corporation. Thoratec Corporation may be served with process through its successor entities, including Abbott Laboratories, via its registered agent for service of process, C T Corporation System, 320 S. Izard Street, Little Rock, Arkansas 72201-2114. Service upon Abbott's registered agent is therefore proper for this Defendant, in addition to service wherever it may be found.

9. Defendant Thoratec, LLC is a limited liability company organized under the laws of the State of California with its principal place of business located at 100 Abbott Park Road, Abbott Park, Illinois 60064. Thoratec, LLC served as the sponsor of the MOMENTUM 3 clinical trial conducted at Baptist Health in 2016 pursuant to an Investigational Device Exemption. In 2015, St. Jude Medical acquired Thoratec Corporation, and in 2017, Abbott Laboratories acquired St. Jude Medical. Upon information and belief, as a result of those acquisitions, Abbott has assumed and/or maintains control over the operations, liabilities, and service of process for Thoratec, LLC. Thoratec, LLC may be served with process through its registered agent for service of process, C T Corporation System, 320 S. Izard Street, Little

Rock, Arkansas 72201-2114. Service upon Abbott's registered agent is therefore proper for this Defendant, in addition to service wherever it may be found.

10. Defendant Baptist Health, an Arkansas nonprofit corporation, d/b/a Baptist Health Medical Center–Little Rock, has its principal place of business at 9601 Baptist Health Drive, Little Rock, Arkansas 72205. Defendant may be served with process through its registered agent for service of process, Patrick M. Young, at Med Towers I, Suite 670, 9601 Baptist Health Drive, Little Rock, Arkansas 72205.

11. Defendant Baptist Health Heart Institute is an Arkansas nonprofit corporation with its principal place of business at 9601 Baptist Health Drive, Little Rock, Arkansas 72205. The Heart Institute is a division and/or affiliated entity of Baptist Health that provides specialized cardiovascular care, including services through its Heart Failure and Transplant Institute. Defendant may be served with process through its registered agent for service of process, Patrick M. Young, at Med Towers I, Suite 670, 9601 Baptist Health Drive, Little Rock, Arkansas 72205.

12. Defendants Baptist Health and Baptist Health Heart Institute jointly participated in, controlled, and/or were responsible for the cardiac care, treatment, monitoring, and management of patients implanted with the HeartMate 3, including Mr. Chappel, through the Heart Failure and Transplant Institute.

13. Defendant John Ransom, M.D., is a physician licensed to practice medicine in the State of Arkansas who, at all relevant times, provided cardiac care, treatment, monitoring, and management to Mr. Chappel, including serving as the principal investigator for the MOMENTUM 3 clinical trial at Baptist Health. Defendant may be served with process at 5021 Ferndale Cut Off Rd, Little Rock, AR 72223, or wherever he may be found.

14. Defendants Abbott Laboratories, St. Jude Medical, Thoratec Corporation, and Thoratec, LLC are collectively referred to herein as the "Manufacturer Defendants."

15. Defendants Baptist Health, Baptist Health Heart Institute, and Dr. John Ransom are collectively referred to herein as the "Healthcare Defendants."

## III. JURISDICTION

16. This Court has subject-matter jurisdiction over this lawsuit pursuant to Ark. Constitution Art. 7 § 11, and Ark. Code Ann. § 16-13-201 *et seq*.

17. This Court has personal jurisdiction over Defendants Abbott Laboratories, St. Jude Medical, Thoratec Corporation, and Thoratec, LLC because they conduct substantial business activities in the State of Arkansas, including manufacturing, distributing, marketing, selling, and supporting investigational and implanted devices within the State, and by sponsoring the MOMENTUM 3 clinical trial conducted in Arkansas.

18. This Court has personal jurisdiction over Defendants Baptist Health and Baptist Health Heart Institute because they conduct substantial business activities in the State of Arkansas and provided medical care, treatment, monitoring, and management to Mr. Chappel at Baptist Health Medical Center–Little Rock, including implantation and related cardiac services provided through the Baptist Health Heart Failure and Transplant Institute and related cardiovascular programs.

## IV. VENUE

19. Venue is proper in Pulaski County, Arkansas, pursuant to Ark. Code Ann. § 16-60-101 et seq., because the cause of action arose in Pulaski County, where Mr. Chappel underwent implantation of the HeartMate 3 as part of the MOMENTUM 3 clinical trial at Baptist Health Medical Center–Little Rock in Little Rock, Arkansas, with implantation and

related cardiac services provided by Defendant Baptist Health Heart Institute through the Baptist Health Heart Failure and Transplant Institute and related cardiovascular programs, and received ongoing treatment and monitoring related to the device.

## V. FACTS

### *A. Mr. Chappel's Medical History and HeartMate 3 Implantation*

20. The HeartMate 3 is a mechanical circulatory support device designed to provide long-term support to patients with advanced heart failure. The device is surgically implanted into the patient's chest and uses a pump to assist the left ventricle in circulating blood throughout the body.

21. Mr. Duval Chappel was born on April 5, 1976, in Magnolia, Arkansas. Mr. Chappel was diagnosed with nonischemic dilated cardiomyopathy and chronic heart failure beginning in or around 2007.

22. Mr. Chappel received treatment and ongoing care for his heart condition from Dr. Steven Wayne Hutchins at Baptist Health Medical Center-Little Rock in Little Rock, Arkansas. Over several years, his condition worsened, despite medical management.

23. By late 2016, Mr. Chappel had advanced to New York Heart Association Class IV heart failure symptoms and was inotrope dependent. He was evaluated for mechanical circulatory support and determined to be a candidate for the MOMENTUM 3 Continued Access Protocol Clinical Trial, sponsored by Defendant Thoratec, LLC, and conducted at Baptist Health through the Baptist Health Heart Institute, with implantation and related cardiac services provided through the Heart Failure and Transplant Institute and related cardiovascular programs. These Defendants derived substantial commercial and regulatory benefit from the trial and its participants, including Mr. Chappel, such as data supporting

Premarket Approval.

24. On or about September 6, 2016, Mr. Chappel signed a Patient Informed Consent form to participate in the MOMENTUM 3 Continued Access Protocol study at Baptist Health, with cardiac services provided by the Baptist Health Heart Institute through the Baptist Health Heart Failure and Transplant Institute. *See* Exhibit A (MOMENTUM 3 Multi-Center Study of MagLev Technology in Patients Undergoing MCS Therapy with HeartMate 3™ Continued Access Protocol).

25. The consent form, titled "MOMENTUM 3 Multi-Center Study of MagLev Technology in Patients Undergoing MCS Therapy with HeartMate 3™ Continued Access Protocol," identified Defendant Thoratec, LLC as the Sponsor and John Ransom, M.D., as the Investigator for the clinical trial at Baptist Health through the Baptist Health Heart Institute and the Heart Failure and Transplant Institute.

26. The consent form explicitly stated on page 10: "*If you are injured by the study process described to you, and the unanticipated or unforeseen injury or the adverse reaction is caused by manufacturing defects or malfunctions of the HeartMate 3, the Sponsor will reimburse the Hospital for the related actual, reasonable, and necessary medical expenses*." *See* Exhibit A at 10.

27. Through this agreement, Thoratec, LLC, as Sponsor of the MOMENTUM 3 clinical trial, expressly accepted responsibility for injuries caused by manufacturing defects or malfunctions of the HeartMate 3.

28. The consent form further provided: "*Nothing in this informed consent shall act to give up any of your legal rights to release the study hospital or clinic, Baptist Health, Thoratec, LLC, the Principal Investigator, or any of their agents from liability for negligence*." *See* Exhibit A at 11.

29. The consent form disclosed risks including death, bleeding, cardiac arrhythmia, respiratory failure, stroke, device thrombosis, and device malfunction, and stated that device malfunction occurred in approximately four percent of cases. However, the consent form did not fully disclose the nature of potential device failures or adequately inform Mr. Chappel of the risks and consequences associated with such malfunctions.

30. On or about December 6, 2016, at Baptist Health, with implantation performed through the Baptist Health Heart Institute and the Heart Failure and Transplant Institute, Dr. John Ransom performed surgery to implant a HeartMate 3 in Mr. Chappel. The implanted device had Serial No. MLP-004486, and the system controller had Serial No. HSC-128.911 (collectively, the "Device"). The Device had not received Premarket Approval from the Food and Drug Administration ("FDA") at the time of implantation.

31. At the time of implantation, the HeartMate 3 was distributed pursuant to an Investigational Device Exemption ("IDE") approved by the FDA under 21 U.S.C. § 360j(g) and 21 C.F.R. Part 812. As an investigational device, the HeartMate 3 and its sponsor, Defendant Thoratec, LLC, were subject to specific federal requirements governing clinical investigations, monitoring of study participants, reporting of adverse events, and compliance with the FDA-approved investigational protocol.

32. Although the HeartMate 3 later received Premarket Approval on or about August 23, 2017, Mr. Chappel's implantation occurred during the IDE clinical trial, and Defendants' study-related monitoring, reporting, and safety obligations for enrolled participants continued as set forth in the FDA-approved protocol and applicable federal requirements, including but not limited to 21 U.S.C. § 360j(g) and 21 C.F.R. Parts 812 and 803.

33. Following implantation, Mr. Chappel remained an active study participant with

regular follow-ups and device interrogations at the Baptist Health Heart Failure and Transplant Institute, which generated real-world performance and durability data for the HeartMate 3.

34. Following FDA approval of the HeartMate 3, Manufacturer Defendants remained subject to ongoing federal regulatory requirements governing the safety and performance of the device. These post-approval obligations included, but were not limited to:

a. adverse event reporting requirements, including Medical Device Reporting under 21 C.F.R. Part 803;

b. post-approval studies and surveillance as required by the FDA;

c. compliance with Quality System Regulations under 21 C.F.R. Part 820;

d. reporting of corrections and removals under 21 C.F.R. Part 806; and

e. compliance with FDA safety communications, recalls, and device correction requirements.

These federal requirements imposed continuing duties on Defendants to monitor, investigate, evaluate, and disclose known or reasonably knowable risks associated with the HeartMate 3.

35. Manufacturer Defendants used data from trial participants, including Mr. Chappel, in support of Premarket Approval on or about August 23, 2017, and subsequent regulatory actions, including approval for use as destination therapy on or about October 18, 2019. Defendants continued to benefit from performance data from Mr. Chappel and other pre-market study participants for long-term analysis after approval.[1]

36. Following implantation of the Device, Mr. Chappel received regular follow-up care at the Baptist Health Heart Failure and Transplant Institute with Dr. John Ransom and his

[1] *See* Premarket Approval (PMA).

associates.

***B. Mr. Chappel's Condition Prior to His Death***

37. Mr. Chappel was doing very well in the months and weeks before his death. On or about February 5, 2024, at a routine follow-up appointment at the Baptist Health Heart Failure and Transplant Institute, Katherine Thomas, APRN, documented that Mr. Chappel was "doing very well" and helping care for his infant granddaughter a few days per week.

38. Specifically, the clinical notes prepared on or about February 5, 2024, stated that Mr. Chappel was "active and helping to keep his infant granddaughter a couple days a week" and "has been doing well and has no acute complaints." Physical examination showed Mr. Chappel was "well compensated" with no edema and no jugular venous distension. Mr. Chappel was classified as New York Heart Association Functional Class I, Stage D heart failure.

39. Mr. Chappel had stable vital signs, and no medication changes were required. Follow-up was scheduled for approximately four months out (around June 5, 2024), confirming his continued stability.

40. Device interrogation on or about February 5, 2024, showed the Device was operating at a baseline speed of 5800 RPM with flow of 4.9 liters per minute, power of 5.1 watts, and pulsatility index of 4.2. The driveline exit site was clean and covered with no signs of infection.

41. In addition, Device interrogation noted repeated defective driveline and communication fault warnings on May 17, 2022; February 8, 2023; November 2, 2023; and February 2, 2024, without further investigation or intervention by Healthcare Defendants and its health care providers to rule out causes such as outflow graft obstruction or pump failure.

***C. Malfunction and Mr. Chappel's Death***

42. On April 10, 2024, Mr. Chappel suddenly developed severe cardiac and

respiratory distress accompanied by a sustained "Low Flow" alarm—a critical warning indicating a significant decrease in pump flow, typically less than 2.5 liters per minute, and commonly associated with obstruction or device malfunction. Given the persistence of this alarm and his rapidly deteriorating condition, Mr. Chappel was instructed to go to the hospital immediately and called emergency medical services himself.

43. When emergency medical services arrived at Mr. Chappel's residence, they found him lying prone in bed and struggling to breathe, with the Device continuing to alarm "Low Flow." Plaintiff Christie Chappel stated that "the doctors told her to get him to the hospital, and call."

44. Mr. Chappel's initial vital signs demonstrated hemodynamic compromise with a blood pressure of 64/58 mmHg, weak pulse of 64 beats per minute, respirations of 14 per minute and labored, and oxygen saturation that would not register. Mr. Chappel was noted to have an initial Glasgow Coma Scale score of 12, indicating altered mental status.

45. During transport to Magnolia Regional Medical Center, Mr. Chappel's condition rapidly deteriorated consistent with Device failure. Mr. Chappel developed agonal breathing and became unresponsive. Emergency medical services personnel placed a King airway for emergency ventilation and began cardiopulmonary resuscitation.

46. Mr. Chappel arrived at Magnolia Regional Medical Center Emergency Department at 12:47 P.M. on or about April 10, 2024, in full cardiac arrest with CPR in progress. Upon arrival, Mr. Chappel was unconscious, unresponsive, and pulseless with a Glasgow Coma Scale score of 3. Mr. Chappel's Device was still alarming.

47. The emergency department physician, Dr. Kevin Michael Diamond, and medical staff performed advanced cardiac life support measures including intubation, multiple

doses of epinephrine, cardioversion, and ongoing chest compressions. Mr. Chappel remained in pulseless electrical activity cardiac arrest throughout resuscitation efforts.

48. Despite approximately 45 minutes of aggressive resuscitation efforts, Mr. Chappel did not achieve return of spontaneous circulation. Dr. Kevin Michael Diamond pronounced Mr. Chappel dead at 1:34 P.M. on April 10, 2024.

49. Due to Mr. Chappel's sudden hemodynamic compromise and cardiac arrest, Dr. Diamond concluded the cause of death to be cardiac arrest due to malfunction of the Device.

50. The Arkansas Department of Health Certificate of Death, completed by Dr. Kevin Michael Diamond, listed the immediate cause of death as "CARDIAC ARREST DUE TO MALFUNCTION LVAD" with underlying causes of "CONGESTIVE HEART FAILURE" and "CORONARY ARTERY DISEASE." The manner of death is listed as "NATURAL." The death certificate specifically identified that the cardiac arrest was "DUE TO MALFUNCTION LVAD," directly attributing Mr. Chappel's death to the malfunction of the Device.

51. Mr. Chappel's terminal event, including sustained low-flow readings, declining perfusion, hemodynamic compromise, and cardiac arrest, is consistent with the clinical presentation associated with known HeartMate 3 device malfunctions, including obstruction-related flow limitations and pump failure.

### *D. <u>Pre-Death Knowledge, Warnings, and Recall of the HeartMate 3</u>*

52. As early as 2022 and continuing through 2023—well before Mr. Chappel's death— Manufacturer Defendants received and analyzed increasing reports of adverse events associated with the HeartMate 3, including outflow graft obstruction, low-flow alarms, thrombus formation, hemodynamic compromise, and death.

53. By early 2024, Manufacturer Defendants had identified a specific and

dangerous failure mode known as Extrinsic Outflow Graft Obstruction ("EOGO"), a condition in which biological material accumulates and restricts blood flow through the device, leading to low-flow alarms, hypoperfusion, cardiac collapse, and death.

54. Upon information and belief, these risks were known to Manufacturer Defendants through adverse event reports, internal analyses, and clinical trial data prior to issuance of formal safety communications.

55. On or about February 19, 2024, Defendant Abbott Laboratories issued an Urgent Medical Device Correction Letter to physicians and hospitals, warning that HeartMate 3 devices were prone to outflow graft obstruction and that persistent low-flow alarms may indicate life-threatening device malfunction.[2]

56. That same day, Defendant Abbott Laboratories initiated a field correction and recall process of the HeartMate 3 based on these risks, including the risk of serious injury and death associated with outflow graft obstruction.[3]

57. On or about March 13, 2024, Defendant Abbott Laboratories initiated an additional recall related to defects in the HeartMate 3 implant kit, which created risks of blood leakage and air entering the system during implantation. *See Id.*

58. On or about March 20, 2024, Defendant Abbott Laboratories issued a follow-up Urgent Medical Device Correction communication to healthcare providers, providing updated warnings and instructions regarding the risks of obstruction, low-flow events, and device-related complications.[4]

---

[2] *See* Abbott, HeartMate 3 LVAS Outflow Graft Advisory (2024), available at https://www.cardiovascular.abbott/content/dam/cv/cardiovascular/pdf/reports/hm-lvas-kits-outflow-graft-advisory.pdf

[3] *See* U.S. Food and Drug Administration, *Class I Device Recall: HeartMate 3 Left Ventricular Assist System,* available at Class 1 Device Recall HeartMate III Left Ventricular Assist System.

[4] *See* Abbott, Urgent Medical Device Correction: HeartMate 3 LVAS (Mar. 2024), available at https://www.cardiovascular.abbott/content/dam/cv/cardiovascular/pdf/reports/device-correction-hm-lvas-mar24.pdf

59. The March 20, 2024 Urgent Medical Device Correction required recipients to distribute the notice within their institutions and to complete and return an acknowledgment form to Defendant Abbott Laboratories confirming receipt and dissemination of the warning, thereby ensuring that healthcare providers were expressly notified of the identified risks prior to Mr. Chappel's death.

60. Upon receiving the February and March 2024 Urgent Medical Device Correction Communications, Healthcare Defendants had a duty to implement and maintain reasonable procedures to identify, monitor, and notify patients implanted with the HeartMate 3 of newly identified risks, including outflow graft obstruction and life-threatening low-flow events.

61. Healthcare Defendants failed to establish or follow adequate systems, protocols, or procedures to ensure that patients—particularly those actively under their care and participating in a clinical trial—were timely informed of these material risks, appropriately monitored, or evaluated for potential intervention.

62. On April 10, 2024, Mr. Chappel suffered cardiac arrest and died following a sustained low-flow event consistent with HeartMate 3 malfunction and outflow graft obstruction.

63. Only after Mr. Chappel's death, on or about April 15, 2024, did the FDA publicly classify the HeartMate 3 recall as a Class I recall, the most serious type of recall, indicating that use of the device may cause serious injury or death.[5]

64. At the time of this recall, Defendant Abbott Laboratories and the FDA reported that the HeartMate 3 had been associated with hundreds of injuries and at least fourteen (14)

[5] *See* U.S. Food and Drug Administration, *Class I Device Recall: HeartMate 3 Left Ventricular Assist System,* available at Class 1 Device Recall HeartMate III Left Ventricular Assist System.

deaths due to outflow graft obstruction.[6]

65. The risks identified in the recall—specifically persistent low-flow alarms, obstruction, hemodynamic compromise, and cardiac arrest—are the same complications experienced by Mr. Chappel immediately prior to his death.

66. Upon information and belief, Manufacturer Defendants possessed this information and knowledge prior to Mr. Chappel's death but failed to adequately disclose it to clinical trial participants, including Mr. Chappel, or to ensure that appropriate monitoring, intervention, or corrective action occurred.

67. Plaintiffs' claims are premised on Defendants' violations of federal requirements both during the investigational phase and after FDA approval of the device. Plaintiffs do not seek to impose obligations different from or in addition to federal law, but instead seek to hold Defendants liable under state law for conduct that violates parallel federal requirements governing the design, manufacture, monitoring, reporting, and post-market safety of the HeartMate 3.

## VI. EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

### *A. Discovery Rule*

68. Plaintiffs' claims arise from risks and failure modes that were not known and could not reasonably have been discovered until after Mr. Chappel's death and subsequent safety communications. Plaintiffs had no reasonable way of knowing that Mr. Chappel's cardiac arrest and death were linked to outflow graft obstruction associated with the HeartMate 3 until such risks were disclosed. Accordingly, the discovery rule applies, and the statute of

---

[6] See U.S. Food and Drug Administration, *Abbott/Thoratec Corp. Recalls HeartMate II and HeartMate 3 Left Ventricular Assist System (LVAS) Due to Risk of Outflow Graft Obstruction* (Apr. 15, 2024), available at Abbott/Thoratec Corp. Recalls HeartMate II and HeartMate 3 Left Ventricular Assist System (LVAS) due to Long-term Buildup Causing an Obstruction | FDA

limitations is tolled until Plaintiffs knew or reasonably should have known of the causal connection between the device and Mr. Chappel's death.

69. Plaintiffs could not have discovered, through the exercise of reasonable diligence, that the HeartMate 3 was susceptible to outflow graft obstruction or that it posed a risk of fatal injury.

70. For these reasons, all applicable statutes of limitations are tolled by operation of the discovery rule.

***B. Fraudulent Concealment***

71. Furthermore, the running of the statute of limitations has been equitably tolled by reason of the fraudulent concealment and conduct of Manufacturer Defendants, as alleged above. Through their affirmative misrepresentations and omissions, Manufacturer Defendants actively concealed the true risks associated with the HeartMate 3, specifically the risk of EOGO and outflow graft obstruction.

72. As a result of the conduct of Manufacturer Defendants, Plaintiffs were unaware and could not reasonably have discovered that Mr. Chappel's death was caused by the risks associated with the HeartMate 3.

73. Manufacturer Defendants are estopped from relying on any statute of limitations because they concealed material information regarding the safety of the HeartMate 3. This information was non-public and exclusively within Manufacturer Defendants' control, and Manufacturer Defendants failed to disclose it to Plaintiffs, the public, or clinical trial participants.

74. Manufacturer Defendants expended substantial resources marketing and promoting the HeartMate 3 despite known or reasonably knowable risks. Plaintiffs and their

healthcare providers reasonably relied on Manufacturer Defendants' representations and had no independent ability to discover the true nature and extent of these risks.

*C.* ***Estoppel***

75. Manufacturer Defendants were under a continuous duty to disclose to consumers, clinical trial participants, and other persons coming into contact with their products, including Plaintiffs, accurate safety information concerning the HeartMate 3 and the risks associated with outflow graft obstruction.

76. Instead, Manufacturer Defendants knowingly, affirmatively, and actively concealed safety information concerning the HeartMate 3 and outflow graft obstruction and the serious risks associated with long-term use of the device.

77. Based on the foregoing, Manufacturer Defendants are estopped from asserting any statute of limitations defense.

## VII. CLAIMS

***A. Claims Against the Manufacturer Defendants***

**Count 1 – Strict Liability (Design Defect)**

78. Plaintiffs bring this strict liability claim against Defendants Abbott Laboratories, St. Jude Medical, Thoratec Corporation, and Thoratec, LLC, for defective design.

79. Manufacturer Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting the HeartMate 3, thereby placing the device into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

80. At the time of implantation in 2016, the HeartMate 3 was distributed pursuant to an Investigational Device Exemption ("IDE") approved by the United States Food and Drug

Administration ("FDA") under 21 U.S.C. § 360j(g) and 21 C.F.R. Part 812 as part of the MOMENTUM 3 clinical trial.

81. As the sponsor and manufacturer of the investigational device, Manufacturer Defendants were subject to specific federal requirements governing the design, testing, manufacture, monitoring, and evaluation of the HeartMate 3 during the clinical trial, including compliance with the FDA-approved investigational plan and applicable federal regulations governing investigational devices.

82. Plaintiffs' claims are based upon Manufacturer Defendants' failure to comply with those federal requirements. Plaintiffs do not seek to impose requirements different from or in addition to federal law but instead assert state-law claims that parallel Manufacturer Defendants' obligations under the IDE regulatory framework.

83. In connection with placing the HeartMate 3 into the stream of commerce, Manufacturer Defendants designed, researched, developed, manufactured, and marketed the device.

84. The HeartMate 3 was defective and unreasonably dangerous because Manufacturer Defendants failed to design, evaluate, and study the device in accordance with the with the investigational plan and governing federal regulations.

85. Manufacturer Defendants knew or had reason to know that the HeartMate 3 presented serious risks of complications, including outflow graft obstruction, cardiac arrest, and death, yet failed to comply with the investigational safeguards and regulatory requirements designed to protect clinical trial participants.

86. The HeartMate 3 was defective and unreasonably dangerous in one or more of the following ways:

a. Manufacturer Defendants failed to design, test, and evaluate the HeartMate 3

in accordance with the FDA-approved investigational plan governing the MOMENTUM 3 clinical trial;

b. Manufacturer Defendants failed to conduct the clinical investigation in a manner reasonably calculated to ensure the safety of trial participants, including Mr. Chappel;

c. Manufacturer Defendants failed to adequately monitor the clinical investigation and ensure compliance with the investigational protocol as required under 21 C.F.R. § 812.40 and § 812.46;

d. Manufacturer Defendants failed to evaluate and respond to emerging safety signals and complications associated with outflow graft obstruction and device malfunction during the clinical investigation;

e. Manufacturer Defendants failed to comply with applicable federal manufacturing and quality control requirements governing investigational devices; and

f. Manufacturer Defendants failed to implement appropriate corrective actions after becoming aware of serious device-related complications.

87. Mr. Chappel was implanted with the HeartMate 3 during his participation in the MOMENTUM 3 clinical trial conducted pursuant to the FDA-approved IDE investigational plan, without knowledge of the device's dangerous characteristics.

88. Mr. Chappel used the HeartMate 3 in its intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

89. Mr. Chappel could not reasonably have discovered the defects and risks associated with the HeartMate 3 prior to implantation.

90. Manufacturer Defendants knew or should have known that failure to comply with the investigational plan and federal regulatory safeguards governing the IDE clinical

investigation created a foreseeable and substantial risk of serious injury or death to trial participants, including Mr. Chappel.

91. Manufacturer Defendants' violations of the investigational plan and applicable federal requirements rendered the HeartMate 3 defective and unreasonably dangerous.

92. As a result of the defective condition of the HeartMate 3, Manufacturer Defendants, are strictly liable to Plaintiffs.

93. The defects in the HeartMate 3 were substantial and contributing factors in causing Mr.

Chappel's injuries and death, and but for Manufacturer Defendants' misconduct and omissions, Mr. Chappel would not have sustained those injuries.

94. Manufacturer Defendants' conduct, as described above, was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of clinical trial participants, including Mr. Chappel, thereby warranting an award of punitive damages.

95. As a direct and proximate result of Manufacturer Defendants placing the defective HeartMate 3 into the stream of commerce and failing to comply with the investigational safeguards governing the device, Mr. Chappel suffered severe injuries and death, and Plaintiffs have sustained damages as alleged herein.

**Count 2 – Strict Liability (Failure to Warn)**

96. Plaintiffs bring this strict liability claim against Defendants Abbott Laboratories, St. Jude Medical, Thoratec Corporation, and Thoratec, LLC, for failure to warn.

97. Manufacturer Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting the HeartMate 3, thereby placing the device into the stream of commerce. The HeartMate 3 was defective and

unreasonably dangerous because it lacked adequate warnings and instructions concerning its dangerous characteristics, including its susceptibility to outflow graft obstruction. These actions were under the ultimate control and supervision of Manufacturer Defendants.

98. Manufacturer Defendants researched, developed, designed, tested, manufactured, labeled, marketed, and distributed the HeartMate 3, and in doing so had a duty to provide adequate warnings and instructions regarding the risks associated with the device, including the risk of outflow graft obstruction. As manufacturers of a medical device, Manufacturer Defendants are held to the knowledge of experts in the field and had a continuing duty to warn of risks that became known or reasonably knowable.

99. At the time of manufacture, Manufacturer Defendants could have provided adequate warnings and instructions regarding the full extent of the risks of the HeartMate 3 because they knew or should have known of the unreasonable risks of harm associated with outflow graft obstruction.

100. Plaintiffs' claims are based on Manufacturer Defendants' failure to comply with federal post-approval regulatory requirements applicable to Class III medical devices. Plaintiffs do not seek to impose requirements different from or in addition to federal law but instead assert state-law claims that parallel Manufacturer Defendants' duties under federal law, including duties to report adverse events, conduct post-market surveillance, comply with quality system requirements, and timely communicate safety risks. Manufacturer Defendants' failure to comply with these federal obligations rendered the warnings inadequate and deprived patients and healthcare providers of material safety information.

101. Manufacturer Defendants failed to adequately investigate, study, and test the safety of the HeartMate 3 or take reasonable steps to minimize the risks to users, including Mr.

Chappel.

102. Manufacturer Defendants knew or should have known that the HeartMate 3 was susceptible to outflow graft obstruction and posed a grave risk of harm, yet failed to exercise reasonable care to warn of those risks. These risks were known or scientifically knowable through appropriate research and testing and were not known to end users, including Mr. Chappel.

103. Manufacturer Defendants further wrongfully concealed information regarding the dangerous nature of the HeartMate 3 and its susceptibility to outflow graft obstruction and made false and misleading statements concerning the safety of the device.

104. At all times relevant to this litigation, the HeartMate 3 reached the intended users in Arkansas and throughout the United States, including Mr. Chappel, without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

105. Mr. Chappel was implanted with the HeartMate 3 in the course of his participation in the MOMENTUM 3 clinical trial, as described above, without knowledge of the device's dangerous characteristics.

106. Mr. Chappel used the HeartMate 3 in its intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

107. Mr. Chappel could not have reasonably discovered or known of the risks of serious injury associated with the HeartMate 3.

108. The warnings and information provided by Manufacturer Defendants were inadequate and failed to communicate the nature, severity, and extent of the risks associated with the HeartMate 3, including outflow graft obstruction. Manufacturer Defendants

disseminated incomplete, inaccurate, and misleading information, continued to promote the device despite knowledge of its risks, and concealed or downplayed material safety information that would have enabled users, including Mr. Chappel, to use the device safely or avoid its use altogether.

109. Manufacturer Defendants have failed to adequately and accurately warn of the true risks associated with the HeartMate 3 and its susceptibility to outflow graft obstruction.

110. As a result of inadequate warnings, the HeartMate 3 was defective and unreasonably dangerous when it left the possession and control of Manufacturer Defendants, was distributed by Manufacturer Defendants, and was implanted in Mr. Chappel.

111. Manufacturer Defendants are liable to Plaintiffs for injuries caused to Mr. Chappel by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information regarding the risks and appropriate use of the HeartMate 3.

112. The defects in the HeartMate 3 were substantial and contributing factors in causing Mr.

Chappel's injuries and death, and but for Manufacturer Defendants' misconduct and omissions, Mr. Chappel would not have sustained his injuries.

113. Had Manufacturer Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with the HeartMate 3, Mr. Chappel could have avoided the risk of developing injuries as alleged herein.

114. As a direct and proximate result of Manufacturer Defendants placing the defective HeartMate 3 into the stream of commerce, Mr. Chappel suffered and endured severe physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, and Plaintiffs have suffered damages as alleged

herein.

**Count 3 – Negligence (Investigational Device Exemption Compliance and Manufacturing Violations)**

115. Defendants Abbott Laboratories, St. Jude Medical, Thoratec Corporation, and Thoratec, LLC, directly or indirectly, caused the HeartMate 3 to be distributed, promoted, implanted, and used by Mr. Chappel as part of a federally regulated clinical investigation.

116. At the time of implantation in 2016, the HeartMate 3 was an investigational Class III medical device distributed pursuant to an IDE under 21 U.S.C. § 360j(g) and 21 C.F.R. Part 812.

117. As sponsors and/or manufacturers of the investigational device, Manufacturer Defendants were subject to specific federal requirements governing clinical investigation, manufacturing, monitoring, informed consent, and reporting of adverse events, including but not limited to:

a. 21 C.F.R. Part 812, including § 812.5 (Labeling), § 812.40 (General responsibilities of sponsors), § 812.46 (Monitoring), and § 812.150 (Reports);

b. 21 C.F.R. Part 50 (Protection of Human Subjects / Informed Consent);

c. 21 C.F.R. Part 820 (Quality System Regulations), where applicable.

118. Plaintiffs rely upon federal requirements only to establish the standard of care and the duties owed by Manufacturer Defendants under Arkansas law.

119. Plaintiffs' claims are based upon Manufacturer Defendants' failure to comply with these federally mandated investigational requirements. Plaintiffs do not seek to impose requirements different from or in addition to federal law but instead assert parallel state-law claims premised upon Manufacturer Defendants' violations of federal requirements governing the IDE clinical investigation.

120. Under 21 C.F.R. § 812.40, Manufacturer Defendants were required to ensure that the investigation was conducted according to the investigational plan and applicable FDA regulations.

121. Under 21 C.F.R. § 812.46, Manufacturer Defendants were further required to properly monitor the investigation and secure compliance from investigators and clinical sites.

122. Under 21 C.F.R. § 812.150, Manufacturer Defendants were also required to submit timely and accurate reports to the FDA regarding unanticipated adverse device effects and serious complications.

123. Upon information and belief, Manufacturer Defendants failed to adequately monitor the clinical investigation and participating clinical sites, including failing to identify, investigate, and address protocol deviations and emerging safety signals related to outflow graft obstruction, and failed to ensure compliance with the investigational protocol regarding the detection, evaluation, and reporting of device-related complications.

124. Despite awareness of obstruction-related complications, Manufacturer Defendants failed to implement timely corrective actions, revise the investigational protocol, or provide updated safety information to investigators and trial participants.

125. Upon information and belief, Manufacturer Defendants failed to timely report adverse device events and obstruction-related complications to the FDA, including events that constituted unanticipated adverse device effects under 21 C.F.R. § 812.150, thereby depriving regulators and investigators of critical safety information.

126. These failures constituted violations of mandatory federal investigational requirements designed to protect human research participants, including Mr. Chappel.

127. As a direct and proximate result of Manufacturer Defendants' violations of IDE

monitoring, reporting, and compliance obligations, the HeartMate 3 implanted in Mr. Chappel malfunctioned, including through outflow graft obstruction, causing catastrophic injury and death.

128. Manufacturer Defendants' conduct in failing to comply with federally mandated investigational safeguards constituted negligence under Arkansas law.

129. Manufacturer Defendants' violations of federal investigational requirements were undertaken with conscious disregard for patient safety and warrant the imposition of punitive damages under Arkansas law.

130. As a direct and proximate result of Manufacturer Defendants' wrongful acts and omissions, Mr. Chappel suffered severe and permanent injuries, pain and suffering, medical expenses, and ultimately death, and Plaintiffs have sustained damages as alleged herein.

**Count 4 – Negligence (Failure to Report)**

131. Defendants Abbott Laboratories, St. Jude Medical, Thoratec Corporation, and Thoratec, LLC were required under 21 C.F.R. § 812.150 and 21 C.F.R. Part 803 to timely report unanticipated adverse device effects, serious injuries, and device malfunctions to the FDA and participating investigators during the IDE clinical investigation.

132. Manufacturer Defendants knew or should have known of serious adverse events, obstruction complications, and device malfunctions occurring during the investigational study prior to and during Mr. Chappel's participation.

133. Manufacturer Defendants failed to timely, accurately, and completely report unanticipated adverse device effects, obstruction-related complications, and device malfunctions to the FDA and participating investigators as required by federal law.

134. Manufacturer Defendants' failure to report deprived the FDA and clinical

investigators of critical safety information necessary to evaluate the risks associated with the HeartMate 3, to implement appropriate regulatory or protocol-based interventions, and to timely warn and protect study participants, including Mr. Chappel.

135. Upon information and belief, Manufacturer Defendants failed to report obstruction-related events that constituted unanticipated adverse device effects under 21 C.F.R. § 812.150 and reportable events under 21 C.F.R. Part 803.

136. Manufacturer Defendants' violations of federal reporting requirements constituted negligence under Arkansas law and were a proximate cause of Mr. Chappel's injuries and death.

137. Manufacturer Defendants' failure to comply with mandatory investigational reporting requirements was undertaken with conscious disregard for patient safety and warrants the imposition of punitive damages under Arkansas law.

**Count 5 – Breach of Express Warranties**

138. Defendants Abbott Laboratories, Thoratec Corporation, and Thoratec, LLC engaged in the business of developing, manufacturing, marketing, selling, distributing, and promoting the HeartMate 3, thereby placing the device into the stream of commerce. These actions were under the ultimate control and supervision of the Manufacturer Defendants.

139. Before the time that Mr. Chappel was implanted with the HeartMate 3, the Manufacturer Defendants made express representations and warranties to users, including Mr. Chappel, that the device was safe and effective for its intended use as a left ventricular assist device providing long-term circulatory support.

140. In the MOMENTUM 3 informed consent form signed by Mr. Chappel, the Manufacturer Defendants expressly warranted that they would accept responsibility for

injuries caused by manufacturing defects or malfunctions of the HeartMate 3. The consent form stated: "*If you are injured by the study process described to you, and the unanticipated or unforeseen injury or the adverse reaction is caused by manufacturing defects or malfunctions of the HeartMate 3, the Sponsor will reimburse the Hospital for the related actual, reasonable, and necessary medical expenses.*"

141. The consent form further provided: "*Nothing in this informed consent shall act to give up any of your legal rights or to release the study hospital or clinic, Baptist Health, Thoratec, LLC, the Principal Investigator or any of their agents from liability for negligence.*"

142. The representations, as set forth above, contained, or constituted affirmations of fact or promises made by the seller to the buyer which related to the device and became part of the basis of the bargain creating an express warranty that the device shall conform to the affirmations of fact or promises.

143. The HeartMate 3 did not conform to the representations made by the Manufacturer Defendants in that it was not safe and effective for its intended use.

144. At all times relevant to this litigation, Mr. Chappel used the HeartMate 3 in its intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

145. Mr. Chappel relied upon the Manufacturer Defendants' express representations and warranties regarding the safety and effectiveness of the HeartMate 3.

146. The breach of the express warranties was a substantial factor in bringing about Mr. Chappel's injuries and death. As a direct and proximate result of the Manufacturer Defendants' breach, Mr. Chappel suffered cardiac arrest and death and sustained severe and permanent pain, suffering, disability, impairment, and economic damages, including for medical care and treatment, and Plaintiffs have suffered damages as alleged herein.

147. Plaintiffs have suffered damages as a direct and proximate result of the Manufacturer Defendants' breach, including those set forth herein.

**Count 6 – Breach of Implied Warranties**

148. Defendants Abbott Laboratories, Thoratec Corporation, and Thoratec, LLC engaged in the business of developing, manufacturing, marketing, selling, distributing, promoting, and implanting the HeartMate 3, thereby placing the device into the stream of commerce. These actions were under the ultimate control and supervision of the Manufacturer Defendants.

149. Before the time that Mr. Chappel was implanted with the HeartMate 3, the Manufacturer Defendants impliedly warranted to users, including Mr. Chappel, that the HeartMate 3 was of merchantable quality and safe and fit for the use for which it was intended, specifically, as a left ventricular assist device to provide long-term circulatory support.

150. Mr. Chappel reasonably relied upon the skill, superior knowledge, and judgment of the Manufacturer Defendants and upon their implied warranties that the HeartMate 3 was of merchantable quality and fit for its intended purpose or use.

151. Plaintiffs are the intended third-party beneficiaries of implied warranties made by the Manufacturer Defendants to Mr. Chappel, and as such Plaintiffs are entitled to assert this claim.

152. The HeartMate 3 was expected to reach and did in fact reach users, including Mr. Chappel, without substantial change in the condition in which it was manufactured and sold by the Manufacturer Defendants.

153. At all times relevant to this litigation, the Manufacturer Defendants were aware that users of the device, including Mr. Chappel, would use the HeartMate 3 as marketed by the

Manufacturer Defendants, which is to say that Mr. Chappel was the foreseeable user of the HeartMate 3.

154. The Manufacturer Defendants impliedly warranted that the HeartMate 3 was of merchantable quality and safe and fit for its intended use as a left ventricular assist device providing long-term circulatory support.

155. In reliance upon the Manufacturer Defendants' implied warranties, Mr. Chappel used the HeartMate 3 in the manner intended, recommended, and marketed by the Manufacturer Defendants.

156. Mr. Chappel could not have reasonably discovered or known of the risks of serious injury associated with the HeartMate 3 and outflow graft obstruction and device failure.

157. The Manufacturer Defendants breached their implied warranties in that the HeartMate 3 was not of merchantable quality and was not safe or fit for its intended use.

158. As a direct and proximate result of the Manufacturer Defendants' wrongful acts and omissions, Mr. Chappel suffered severe and permanent physical and emotional injuries. Mr. Chappel endured pain and suffering, suffered economic loss including significant expenses for medical care and

treatment, and Plaintiffs have suffered and will continue to suffer damages as alleged herein.

***B. Claims Against the Healthcare Defendants***

**Count 7 – Medical Negligence**

159. Plaintiffs bring this claim for medical negligence against Defendants Baptist Health, Baptist Health Heart Institute, and Dr. John Ransom.

160. Defendant Dr. John Ransom was a physician involved in the care, treatment,

monitoring, and follow-up of Mr. Chappel in connection with his HeartMate 3 device, and at all times relevant acted within the course and scope of his employment and/or agency with Baptist Health and Baptist Health Heart Institute.

161. Healthcare Defendants owed Mr. Chappel a duty to exercise that degree of skill, care, and learning ordinarily possessed and used by reasonably prudent healthcare providers in the same field or specialty, acting under the same or similar circumstances and in the same or a similar locality.

162. Healthcare Defendants owed Mr. Chappel a duty to place a priority on his medical care needs over the direct and indirect benefits they received as a Clinical Trial Center for Defendant Abbott Laboratories.

163. Defendants Baptist Health and Baptist Health Heart Institute served as the clinical trial site for the MOMENTUM 3 Continued Access Protocol trial, acted as the hospital where Mr. Chappel's HeartMate 3 was implanted, and provided ongoing outpatient follow-up care and device monitoring at the Baptist Health Heart Failure and Transplant Institute.

164. As the clinical trial site and ongoing care provider for Mr. Chappel, Healthcare Defendants had heightened duties to monitor Mr. Chappel's device function, educate Mr. Chappel regarding warning signs of device malfunction, and provide appropriate follow-up care commensurate with his status as a clinical trial participant with a long-term implanted device.

165. As the clinical trial site and ongoing care provider for Mr. Chappel, Healthcare Defendants had heightened duties to implement appropriate and regular screening for device malfunction, including, but not limited to, appropriate clinical assessment and advanced imaging and diagnostic evaluation when clinically indicated, to identify and treat early outflow

graft or device stenosis, occlusion, or obstruction.

166. Healthcare Defendants, individually and/or through their agents, servants, and employees, breached the standard of care owed to Mr. Chappel in one or more of the following ways:

a. Failing to provide adequate education and training to Mr. Chappel and Plaintiff Christie Chappel regarding recognition of device malfunction warning signs, specifically low-flow alarms, and appropriate emergency responses;

b. Failing to adequately monitor Mr. Chappel's Device for signs of outflow graft obstruction or other complications, particularly given his status as a clinical trial participant with a device that had been implanted for over seven years;

c. Failing to screen Mr. Chappel's Device for earlier signs of outflow graft stenosis, occlusion, or obstruction with readily available clinical criteria and CT or percutaneous angiography;

d. Scheduling follow-up appointments at intervals that were too infrequent for a clinical trial participant with a long-term implanted experimental device, specifically scheduling the next follow-up approximately four months after the February 5, 2024, visit, despite Mr. Chappel's Device having been in place for over seven years;

e. Failing to implement or follow appropriate protocols for monitoring clinical trial participants for device-related complications and emerging safety signals;

f. Failing to provide Mr. Chappel with specific instructions regarding what actions to take in the event of a low-flow alarm beyond "get to the hospital immediately;"

g. Failing to communicate with or coordinate with local emergency services and hospitals in Columbia County regarding LVAD emergency protocols;

h. Failing to ensure that Mr. Chappel had adequate access to LVAD-specialized emergency care given his residence in Magnolia, Arkansas, which is approximately 130 miles from Baptist Health Medical Center in Little Rock;

i. Failing to obtain, review, or act upon emerging safety data regarding outflow graft obstruction in the HeartMate 3, particularly as a clinical trial investigation site with access to sponsor safety communications;

j. Failing to update or supplement patient education materials and emergency protocols in light of accumulating evidence regarding outflow graft obstruction

risks in long-term HeartMate 3 users.

k. Failing to implement and maintain reasonable systems, protocols, and procedures to identify, track, and notify patients implanted with the HeartMate 3 of newly identified risks after receiving Urgent Medical Device Correction communications in February and March 2024;

l. Failing to timely inform, monitor, and evaluate Mr. Chappel in response to known risks of outflow graft obstruction and life-threatening low-flow events despite receiving and acknowledging manufacturer safety communications;

167. At all times relevant, Defendant Dr. John Ransom was acting within the course and scope of his employment and/or agency with Baptist Health and Baptist Health Heart Institute, and such Defendants are vicariously liable for his acts and omissions.

168. Healthcare Defendants knew or should have known that Mr. Chappel, as a clinical trial participant with a HeartMate 3 that had been implanted for over seven years, faced increased risk of device-related complications, including outflow graft obstruction.

169. Healthcare Defendants' breaches of the standard of care were substantial and contributing factors in causing Mr. Chappel's injuries and death. Had Healthcare Defendants implemented reasonable procedures and timely acted upon known safety warnings, including monitoring and responding to low-flow conditions, Mr. Chappel's outcome would have been different.

170. As a direct and proximate result of Healthcare Defendants' medical negligence, Mr. Chappel suffered cardiac arrest and death, and Plaintiffs have suffered damages as alleged herein.

### *C. Claims Against All Defendants*

### Count 8 – Loss of Consortium

171. At all times relevant, Plaintiff Christie Chappel was the lawful spouse of Mr. Chappel and shared a close, loving, and supportive marital relationship with him.

172. As a direct and proximate result of one or more of the wrongful acts or omissions of all Defendants described above, Plaintiff Christie Chappel has been and will continue to be deprived of the comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium of her husband, Mr. Chappel.

173. As a further result of Defendants' conduct and Mr. Chappel's injuries and death, Plaintiff Christie Chappel has suffered and will continue to suffer damages as allowed by law.

**Count 9 – Wrongful Death**

174. Plaintiff Christie Chappel, individually and as surviving spouse of Mr. Duval Chappel, deceased, brings this action for wrongful death pursuant to Ark. Code Ann. § 16-62-102. Plaintiffs Christie Chappel, Brandi Chappel (Davy'Ance), and Bradasha Chappel are the surviving heirs and statutory beneficiaries of Mr. Chappel.

175. The injuries and death of Mr. Chappel were directly and proximately caused by the wrongful acts, omissions, and fraudulent misrepresentations of all Defendants, as set forth more fully above.

176. As a direct and proximate result of Defendants' conduct, including but not limited to the defective HeartMate 3 and the negligent acts and omissions of Defendants, Mr. Chappel suffered fatal injuries.

177. As a result of the death of Mr. Chappel, Plaintiff Christie Chappel is entitled to recovery for loss of love, companionship, comfort, support, affection, society, solace, and moral support of her husband, and as further provided under Ark. Code Ann. § 16-62-102.

178. As a result of the death of Mr. Chappel, Plaintiffs Brandi Chappel (Davy'Ance) and Bradasha Chappel are entitled to recovery for loss of love, companionship, comfort, support, affection, society, guidance, and parental care, and as further provided under Ark. Code

Ann. § 16-62-102.

179. Plaintiffs are entitled to recover all damages available under Arkansas law for wrongful death, including economic and non-economic damages, as a direct and proximate result of Defendants' wrongful conduct, including the defective condition of the HeartMate 3 and Defendants' negligent acts, omissions, and misrepresentations.

180. Pl Plaintiffs have suffered mental anguish as a result of Mr. Chappel's death and are entitled to recover such damages pursuant to Ark. Code Ann. § 16-62-102.

**Count 10 – Fraudulent Concealment**

181. Defendants are equitably estopped from asserting any statute of limitations defense because they fraudulently concealed material facts regarding the safety and risks of the HeartMate 3, including its propensity for outflow graft obstruction, low-flow events, cardiac arrest, and death.

182. As set forth above, Defendants possessed actual knowledge—based on adverse event data, internal analyses, and clinical experience—that the HeartMate 3 was subject to dangerous and recurring failure modes, including Extrinsic Outflow Graft Obstruction ("EOGO").

183. By early 2024, Defendants had identified these risks and, on or about February 19, 2024, began issuing urgent warnings to physicians and hospitals through an Urgent Medical Device Correction Letter, acknowledging that persistent low-flow alarms could indicate life-threatening obstruction and device failure.

184. Defendants continued to issue additional safety communications and recall-related notices in March 2024 addressing obstruction, low-flow events, and device-related complications.

185. Despite this knowledge and these communications to healthcare providers, Defendants failed to disclose these material risks to patients, while Mr. Chappel remained implanted with the device and under ongoing clinical care and monitoring associated with the clinical trial.

186. At no time prior to Mr. Chappel's death did Defendants adequately inform him that his device was at risk of obstruction, that persistent low-flow alarms could signal impending catastrophic failure, or that the device was subject to recall-level safety concerns.

187. On April 10, 2024, Mr. Chappel suffered cardiac arrest and died following a sustained low-flow event consistent with the very failure mode Defendants had identified and warned providers about prior to his death.

188. Only after Mr. Chappel's death, on or about April 15, 2024, did the FDA publicly classify the HeartMate 3 recall as a Class I recall, confirming that the device posed a risk of serious injury or death.

189. Defendants' concealment of these material facts—including their knowledge of obstruction risks, low-flow alarm significance, and recall-level safety concerns—prevented Plaintiffs from discovering the true cause of Mr. Chappel's injuries and death.

190. Defendants had a duty to disclose this information because:

a. they possessed superior and exclusive knowledge of the device's risks;

b. they made partial disclosures that were misleading without full disclosure; and

c. Mr. Chappel's status as a clinical trial participant imposed heightened duties of transparency, monitoring, and informed consent.

191. Instead, Defendants actively concealed and suppressed this information by:

a. failing to timely disclose known risks to patients;

b. limiting critical safety communications to healthcare providers;

c. continuing to represent the device as safe for long-term use; and

d. failing to update or re-consent clinical trial participants in light of emerging safety risks.

e. failing to timely report adverse events and obstruction-related complications in a manner that would have triggered earlier regulatory action and broader patient warnings.

192. Plaintiffs did not know and could not have reasonably discovered through the exercise of due diligence, that Mr. Chappel's cardiac arrest and death were caused by HeartMate 3 malfunction and outflow graft obstruction until after Defendants' post-death disclosures and FDA recall.

193. As a direct and proximate result of Defendants' fraudulent concealment, the applicable statute of limitations was tolled, and Defendants are equitably estopped from asserting any limitations defense.

## VIII. DAMAGES

194. Because of Mr. Chappel's bodily injuries and death proximately caused by Defendants' conduct, Plaintiffs are entitled to recover all damages available under Arkansas law, including but not limited to:

a. Past and future medical expenses and charges;

b. Past and future physical impairment;

c. Past lost wages and future loss of earning capacity;

d. Loss of services and household contributions;

e. Funeral and burial expenses;

f. Mental anguish of the statutory beneficiaries; and

g. Loss-of-life damages.

195. Plaintiffs allege that clear and convincing evidence will show that Defendants acted with reckless disregard for the rights and safety of Mr. Chappel and Plaintiffs, with conscious indifference to the consequences of their conduct. Defendants had actual knowledge of the risks associated with the HeartMate 3, including outflow graft obstruction and related complications, yet failed to take appropriate action to protect patients, including Mr. Chappel. Accordingly, Plaintiffs seek an award of punitive damages against Defendants.

## IX. JURY DEMAND

196. Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

## X. CONDITIONS PRECEDENT

197. All conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

## XI. PRAYER

198. WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Plaintiffs have, upon final trial, among other things:

a. Judgment against Defendants for compensatory damages;

b. Judgment for punitive damages;

c. Pre-judgment and post-judgment interests, as authorized by law on the judgments which enter on Plaintiffs' behalf;

d. Costs of suit, including reasonable attorneys' fees, court costs, and other litigation expenses; and

e. Such other and further relief as this Court may deem proper and just.

***(Signature on following page)***

Respectfully submitted,

**THE POTTS LAW FIRM, LLP**

*/s/ J. Ryan Fowler*
Arkansas State Bar No. 2014109
Derek H. Potts
Arkansas State Bar No. 2006131
POTTS LAW FIRM, LLP
3737 Buffalo Speedway, Suite 1900
Houston, Texas 77098
Tel: (713) 963-8881
rfowler@potts-law.com
dpotts@potts-law.com

**ATTORNEY FOR PLAINTIFFS**